## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **LISA SHAFFETT** | **CIVIL ACTION** |
| **VERSUS** | **NO:  15-5452** |
| **SOCIAL SECURITY ADMINISTRATION** | **SECTION: "B"** |

### REPORT AND RECOMMENDATION

This is an action for judicial review of a final decision of the Commissioner of the Social Security Administration ("the Commissioner") pursuant to Title 42 U.S.C. § 405(g). The Commissioner denied Plaintiff, Lisa Shaffett's ("Shaffett") request for Supplemental Security Income Benefits ("SSI") pursuant to Title XVI, 42 U.S.C. § 423.[1]   The matter was referred to the undersigned pursuant to Title 28 U.S.C. § 636(b), for the submission of Proposed Findings and Recommendations.

## I.    Background

Shaffett is a forty-three-year-old,[2] 273 pound, 5' 8" female,[3] with a high school education,[4] who has past relevant work as a resident service specialist.[5] She complains of disability due to a pinched nerve in her lower back, diabetes, depression, arthritis and tendonitis in the knee and migraine headaches. R. Doc. 11-3, Tr. 48. Her application was denied at the initial level on October 24, 2011. *Id.* at Tr. 57.

---

[1]R. Doc. No. 1, p.1.

[2]R. Doc. No. 12, p. 1.

[3]R. Doc. 11-3, Tr. 48.

[4]R. Doc. No. 12, p. 1.

[5]R. Doc. 11-6, Tr. 226.

She filed a timely request for hearing on October 28, 2011. R. Doc. 11-4,  Tr.  84-86.   A hearing was held before Administrative Law Judge ("ALJ"), Christopher Juge. R. Doc. 11-3, Tr. 59-71.    Thereafter, the ALJ issued an opinion denying Shaffett's request for Supplemental Security Income Benefits on May 23, 2012. *Id.*

 The ALJ found that Shaffett has not engaged in substantial gainful activity at any time since July 1, 2011.  *Id.* at Tr. 64, Finding 1. He further concluded that Shaffett has degenerative disc disease of the cervical spine, diabetes mellitus, obesity and anxiety.  *Id.* at Tr. 64, Finding 2. He further found that Shaffett's mental impairment does not meet or medically equal the criteria of listing levels 12.04 and 12.06.  He noted that in reaching this conclusion, he considered whether Shaffett satisfied "Paragraph B," which requires marked difficulties of daily living activities, social functioning and maintaining concentration, persistence and pace. *Id.* at Tr. 65. He found that Shaffett has the residual functional capacity to perform light work. *Id.* at Tr. 65, Finding 4.

The ALJ found that Shaffett was unable to perform her relevant work as a mental retardation aide, a medium-level, skilled job.  *Id.* at Tr. 70, Finding 5.  He found that Shaffett was born on March 10, 1973; was 38 years old, which is defined as a younger individual age 18-49; had at a least a high school education; and was able to speak English. *Id.* at Tr. 70, Findings 6 and 7. The ALJ found that considering her age, education, work experience and residual function capacity there are jobs that exist in significant numbers in the national economy that Shaffett could perform. *Id.* at Tr. 78, Finding 9.  Shaffett filed an appeal challenging the denial of her request for benefits on July 18, 2012. R. Doc. 11-4, Tr. 123.  On August 30, 2013, the Appeals Council vacated the hearing decision and remanded the case to an Administrative Law Judge for the resolution of two issues.  R. Doc. 11-3, Tr. 77.  First, the Council found that the ALJ did not include rationale

with references to the record in support of the ratings of mild restriction in daily living and moderate restrictions in social functioning and concentration, persistence or pace. *Id*. Second, the Appeals Council required a more comprehensive discussion of the impact of Shaffett's mental limitations on her residual functional capacity as described in 20 CFR 416.920a requiring findings and appropriate rationale for each functional area. *Id*.

More specifically, the Council required the ALJ to consider Shaffett's maximum residual functional capacity providing an appropriate rational with specific references to evidence supporting the limitations and the impact of the mental restrictions on her residual functional capacity. *Id*. Finally, if necessary, the ALJ was permitted to obtain evidence from a vocational expert to clarify the effect of  the assessed limitations on Shaffett's occupational base. *Id*.

Another hearing was held before the ALJ on January 7, 2014 (R. Doc. 11-2, Tr. 34-47) and the ALJ again issued an unfavorable decision on February 26, 2014. *Id.* at Tr. 15-28.

Thereafter, Shaffett filed the instant action in federal court, on October 23, 2015, seeking review of the ALJ's decision.[6]

On review, Shaffett raises two issues:

1. Whether substantial evidence supports the ALJ's finding that Interstitial Cystitis is non-severe where the ALJ failed to include in the RFC limitations from the interstitial cystitis?
2. Whether substantial evidence supports the ALJ's RFC finding of light work?

## II.    <u>Standard of Review</u>

The role of this Court on judicial review under Title 42 U.S.C. § 405(g) is limited to determining whether (1) the final decision is supported by substantial evidence and (2) whether

---

[6]R. Doc. No. 1, p. 1.

the Commissioner applied the proper legal standards when evaluating the evidence. *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999) (quoting *McQueen v. Apfel*, 168 F.3d 152, 157 n. 2 (5th Cir.1999)).  The Court may not re-weigh the evidence, try issues *de novo*, or substitute its judgment for that of the Commissioner. *See Allen v. Schweiker*, 642 F.2d 799, 800 (5th Cir. 1981).  If supported by substantial evidence, the Commissioner's findings are conclusive and must be affirmed. *Id.* However, an ALJ's failure to apply the correct legal test constitutes a ground for reversal. *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

Substantial evidence is more than a scintilla and less than a preponderance, and is considered relevant such that a reasonable mind might accept it as adequate to support a conclusion. *Ripley v. Chater,* 67 F.3d 552, 555 (5th Cir. 1995) (citing *Richardson v Perales*, 402 U.S. 389, 401 (1971)). It must do more than create a suspicion of the existence of the fact to be established, but no "substantial evidence" will be found where there is only a "conspicuous absence of credible choices" or contrary medical evidence. *See Payne v. Weinberger*, 480 F.2d 1006, 1007 (5th Cir. 1973); *Hemphill v. Weinberger*, 483 F.2d 1137, 1138 (5th Cir. 1973). However, a single piece of evidence will not satisfy the substantiality test if the ALJ ignores, or fails to resolve, a conflict created by countervailing evidence. Evidence is not substantial if it is overwhelmed by other evidence, particularly evidence offered by treating physicians. *Franklin v. Soc. Sec. Admin.*, No. 12-2681, 2013 WL 5739078, at *2 (E.D. La. Oct. 22, 2013) (citing *Kent v. Schweiker,* 710 F.2d 110, 114 (3rd Cir. 1983)).

The ALJ must give controlling weight to the opinion of a treating physician if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence." *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir.

4

1995) (citing 20 C.F.R. § 404.1527(d)(2)). However, "'[t]he [Commissioner] is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'" *Martinez*, 64 F.3d at 175 (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)). The relevant criteria to be considered by the ALJ are: (1) the physician's length of treatment of the claimant; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support of the physician's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the treating physician. *See* 20 C.F. R § 404.1527. "Good cause for abandoning the treating physician rule includes 'disregarding statements [by the treating physician] that are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by evidence'." *Legett v. Chater,* 67 F.3d 558, 566 (5th Cir. 1995) (citing *Greenspan v. Shalala,* 38 F.3d 232, 237 (5th Cir. 1994)).

Where there is reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, the "ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under 20 CFR 404.1527(d)(2)." *Newton v. Apel*, 209 F.3rd 448, 453 (5th Cir. 2000). Further, regardless of the opinions and diagnoses of medical sources, "the ALJ has sole responsibility for determining a claimant's disability status." *Martinez*, 64 F.3d at 176 (quoting *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir.1990)).

Finally, the Court "'weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnosis and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4)

his age, education, and work history.'" *Hendricks v. Apfel*, No. 99-1212, 2000 WL 174884, at *3 (E.D.La. Feb. 14, 2000) (quoting *Martinez v. Chater*, 64 F.3d at 174).

The concept of disability is defined in the Social Security Act as the "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted . . . for a constructive period of not less than twelve months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). Section 423(d)(3) of the Act further defines "physical or mental impairment" as "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

### III.   Analysis

#### A.   Whether substantial evidence supports the ALJ's finding that Interstitial Cystitis is non-severe where the ALJ failed to include in the RFC limitations from the interstitial cystitis?

Shaffett contends that she began experiencing Interstitial Cystitis (I.C.) symptoms in March 2011 when she saw a urologist due to an inability to "hold her urine". R. Doc. 12, p. 5. She contends that due to the frequency of her incontinence, the multiple procedures she endured to cure the problem, the medications she took and the pain she experienced, the ALJ erred when he found that the I.C. had a minimal effect on her ability to perform basic work activities. *Id.* at p. 5-6. She contends that because she would submit to monthly DSMO[7] treatment which would require her to

---

[7] "During a bladder instillation, also called a bladder wash or bath, the bladder is filled with a solution that is held for varying periods of time, averaging 10 to 15 minutes, before being emptied. The only drug approved by the U.S. Food and Drug Administration (FDA) for bladder instillation is dimethyl sulfoxide (Rimso-50), also called DMSO. DMSO treatment involves guiding a narrow tube called a catheter up the urethra into the bladder. A measured amount of DMSO is passed through the catheter into the bladder, where it is retained for about 15 minutes before being expelled. Treatments are given every week or two for 6 to 8 weeks and repeated as needed." R. Doc. 12, p. 6.

be absent from work along with her frequent visits to the restroom, the I.C. impairment is a severe impairment contrary to the ALJ's finding such that his finding. *Id.*

In opposition, the Commissioner contends that the ALJ applied the correct legal standards when he evaluated plaintiff's I.C. R. Doc. 13, p. 4. The Commissioner contends that the ALJ considered the I.C. condition but concluded that the impairment was not severe within the meaning of *Stone v. Heckler,* 752 F. 2d 1099 (5th Cir. 1985) *Id.* The Commissioner contends that the ALJ properly found that no physician had previously opined that I.C. produced functional limitations that exceed the limitations set forth in his residual functional capacity determination. *Id.* As a result, the Commissioner contends that the ALJ's finding is based upon substantial evidence.

The record shows that the ALJ noted Shaffett's testimony that she has I.C., which causes spasms. R. Doc. 11-2, Tr. 23  He noted that she testified that she has too urinate two to three times per night and twelve to fifteen times per day. *Id.* He noted further that the treatment she received for her I.C. has caused diarrhea, constipation and rectal bleeding. *Id.*

The ALJ found that after considering the evidence, Shaffett had medically determinable impairments that could cause some of the symptoms alleged but that her statements concerning the intensity, persistence and limiting effects of the symptoms were not entirely credible. *Id*. He further noted her testimony that she stopped working due to neck and back problems. *Id.* at Tr. 27. He also noted in contrast that she told the consultative psychological examiner that she left work because she had to care for her son who had bipolar disorder and a bad back. *Id.*

In explaining why he found Shafett's I.C. "non-severe", the ALJ noted that she experienced no more than a slight abnormality having such minimal effect on her that it would not interfere with her ability to work.  *Id.* at Tr. 21.  In reaching this conclusion, he noted that the medical

evidence revealed that she did well with her treatment ultimately reporting few to no symptoms. *Id.* He noted that the last medical evidence of record did not indicate any follow-up treatment for the I.C. while her previous visit reported a nighttime frequency of two times and a daytime frequency of ten to twelve times. *Id.*

The evidence shows that prior to being treated for I.C., Shaffett reported urinary frequency of twenty times a day and four times per night with episodes of incontinence, leakage and bedwetting. R. Doc. 11-7, Tr. 467. The treatment seemingly resulted in a reduction of her urinary frequency, elimination of the incontinence, leakage and bedwetting problems.

It is important to note that the Plaintiff is required to establish that she suffered from an IC of disabling severity. The mere presence of some impairment is not disabling per se. Plaintiff must show that she was so functionally impaired by her urinary incontinence that she was precluded from engaging in any substantial gainful activity. *Demandre v. Califano,* 591 F.2d 1088, 1090 (5th Cir.1979); *see also, Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983).

In the absence of objective medical evidence indicating that Plaintiff suffered disabling incontinence, Plaintiff failed to meet her burden of proving disability. *Demandre,* 591 F.2d at 1090*; Dvorak v. Celebrezze,* 345 F.2d 894, 896-97 (10th Cir.1965); *see also, Hames*, 707 F.2d at 165*.* Therefore there is substantial evidence supporting the ALJ's finding that Shaffett's Interstitial Cystitis is not a disabling condition.

**B.     Whether substantial evidence supports the ALJ's RFC finding of light work?**

Shaffett next contends that the reasons the ALJ provided for finding Shaffett not credible are contrary to the evidence of record and insufficient to support an adverse credibility finding. R. Doc. 12, p. 7. Shaffett contends that the ALJ's credibility analysis was insufficient because he

8

wrongly relied upon the fact that Shaffett was able to take care of her son when actually the son was the one who helped her. *Id.* at p. 10.Shaffett further contends that the ALJ's finding that the objective evidence showed only minor abnormalities is not supported by the record.  Shaffett contends that the ALJ failed to consider her obesity and its impact on her knee and back pain and that the ALJ failed to find a limitation as a result of the anxiety and depression she experiences. *Id.* at p. 12.

The Commissioner contends that the records suggest that the ALJ was not required to incorporate mental limitations into his residual functional capacity determination because Shaffett testified that she was not disabled due to mental problems.  R. Doc. 13, p. 6. The Commissioner further contends that the ALJ properly considered the factors that relate to Shaffett's credibility and her subjective complaints as compared to the evidence of record. *Id.*

 In assessing the claim, the ALJ noted that while Shaffett has some symptoms, her onset date is remote in comparison to her symptoms. R. Doc. 11-2, Tr. 27. He noted the contradiction in Shaffett's story about why she quit work. *Id.* He pointed out that Shaffett alleged that she quit work due to her impairments but that she told Dr. Durdin that she quit to take care of her older teen son who is disabled with bipolar disorder and who has been violent towards her. Rec. Doc. 11-3, Tr. 69.

The ALJ noted that according to the medical records Shaffett left work in 2008 but that the earliest medical evidence of record was from April 2010. R. Doc. 11-2, Tr. 27. The ALJ found that based upon a comparison of the time she quit work and the first evidence of medical treatment that it was not plausible that she would have waited two years before seeking medical treatment if she really left due to pain and limitations. *Id.* The ALJ also found it not likely that Shaffett who claims

to be incapable of sedentary work would give up a job to care for a violent, mentally ill person. *Id.* He further found that most of her symptoms can be related to morbid obesity[8] and she had been counseled to lose weight but there was no evidence that she seriously tried to do so. The ALJ further noted that despite her weight, she was able to perform medium work. He noted that her neck and back problems where chronic with no surgical recommendation. *Id.* He also noted there is no evidence of end organ damage due to diabetes. *Id.*

By way of further example, the ALJ noted that Shaffett claimed that she could not move or walk and yet she was told to exercise and lose weight (*id.*) as reflected by the medical records from Southeastern Community Health Systems. R. Doc. 11-7, Tr. 439-441. The ALJ further noted that she complained of knee pain but that the x-ray showed no significant abnormality but that she later had an arthroscopic partial medial meniscectomy and chondroplasty of medial femoral condyle and that she had full range of motion of her right knee. R. Doc. 11-2, Tr. 26. He further noted that anxiety and depression were mentioned in the records but he also noted that Shaffett had no psychiatric testing or counseling. R. Doc. 11-2, Tr. 70.

The ALJ even referenced her activities of daily living. He noted that she reported to Dr. Durdin that she does chores and cuts the grass while at the same time claims that her disability was

---

[8]Obesity is condition that is often associated with disturbances of the musculoskeletal system, respiratory system, and cardiovascular system." Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity." See 20 C.F.R. pt. 404, subpt. P, app. 1. .  Social Security Ruling 02–01 p does not mandate a particular mode of analysis of obesity, as it states only that obesity, in combination with other impairments, "may" increase the severity of the other limitations. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411–12 (6th Cir.2006 ) ("It is a mischaracterization to suggest that Social Security Ruling 02–01 p offers any particular procedural mode of analysis for obese disability claimants."). Nor does it require an ALJ to specifically reference the ruling in this analysis.

physical and not mental. *Id.* In light of the evidence, the ALJ concurred with the finding of Dr. Charles Lee who concluded that Shaffett could perform light work. R. Doc. 11-2, Tr. 23.

On March 16, 2016, the Social Security Administration (SSA) published Social Security Ruling ("SSR") 16-3p – Evaluation of Symptoms in Disability Claims. The new SSR supersedes SSR 96-7p – Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individuals' Statements. In rescinding SSR 96-7p, SSA is proactively "eliminating" the use of the term credibility, and clarifying that "subjective symptom evaluation is not an examination of an individual's character." SSA instructs its adjudicators to consider all the evidence when evaluating the intensity and persistence of symptoms—once they have found a medical determinable impairment that could produce those symptoms.

The SSR generally tracks the regulatory language of 20 C.F.R. §§ 404.1529[9] & 416.929, including setting forth the two-step process for evaluating symptoms: whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms; and the extent to which, given the intensity and persistence of symptoms such as pain, the symptoms limit an individual's ability to perform work-related activities for an adult, or function for a child.

---

[9]In evaluating symptoms the ALJ must determine if they are reasonably consistent with the evidence of record under the factors listed at 20§ C.F.R. 404.1529(c):

    i.       Your daily activities;
    ii.      The location, duration, frequency and intensity of your pain or other symptoms;
    iii.     Precipitating and aggravating factors;
    iv.     The type, dosage, effectiveness and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
    v.      Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
    vi.     Any measures you use or have used to relieve your pain or other symptoms
    vii.    Any other factors concerning your functional limitations and restrictions due to pain or other symptoms.
20 C.F. R. §404.1529(c)(3);  SSR 16-3p.

The regulation provides that adjudicators are to look for consistency of symptoms with objective medical evidence, including the consistency of the claimant's own statements.  Per SSR 16-3p, it is not sufficient for an adjudicator to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered," or that "the statements about the individual's symptoms are (or are not) supported or consistent." Adjudicators must base their findings on evidence in the case record, and are prohibited from soliciting non-medical evidence outside of the record.  They also must limit their evaluation to the individual's statements and the evidence of record.  They must not assess "an individual's overall character or truthfulness in the manner typically used for an adversarial court litigation."

The ALJ included an exhaustive analysis that considered each of Shaffett's impairments and compared them to the medical evidence.  Shaffett's first claim is that just because she did not have surgery does not mean that her symptoms are not severe.  She contends that she underwent painful tests, epidural steroid injections and an arthroscopic knee surgery. R. Doc. 12, p. 11. Shaffett contends that the correct inquiry revolves around the severity of her symptoms and limitations demonstrated in the record and treating physician, Dr. Beaucodray. *Id.* She contends that she is limited in her ability to stand and walk and that she is not able to stand and walk for a total six (6) hours per day as determined by the ALJ.

The record supports the ALJ's finding that Shaffett's residual functional capacity ("RFC") does not render her disabled.  For example, the ALJ noted that Shaffett had a neurological consultation with Dr. Troy Beaucodray on January 31, 2011 and that his impression was that she suffered with chronic low back pain and that she was being evaluated to rule out radiculopathy. R. Doc. 11-3, Tr. 67.  Thereafter on February 25, 2011 an MRI of the spine was conducted and the

12

nerve conduction study noted no abnormality in the lower extremities bilaterally but indicated the presence of right lumbosacral radiculopathy. *Id*. She returned to Dr. Beaucodray three days later and he administered a lumbar epidural steroid injection and she was instructed to return in two months. *Id*.  Five months later the neurologist increased her medication and she reportedly had been to the Emergency Room for severe neck pain.  She again saw Dr. Beaucodray almost a year later on January 25, 2012 and complained of neck and low back pain. R. Doc. 11-2, Tr. 24. He noted the details of the physical examination and tenderness present upon palpation but with motor strength 5/5.  Dr. Beaucodray noted that there was a give-away weakness in the right upper extremity secondary to pain.  *Id*.  Five months later she was seen by Dr. Beaucodray and continued to complain of pain despite medication and reported that she was using a cane for assistance *Id.* at Tr. 25.  The ALJ noted that no cane was used that day and her motor strength was 5/5 of both upper and lower extremities. *Id.*  He noted that she also had normal tone and muscle bulk. *Id.*

The record confirms that she is obese weighing 284 lbs. as of February 16, 2012 which was also noted by the ALJ who considered the impact of her weight on her ability to function and determined that her obesity is a severe impairment. R. Doc. 11-7, Tr. 439; R. Doc. 11-2, Tr. 26-27. For example while during the ALJ hearing she testified that she could not do chores, and she described the inability to hold cups or plates, she also reported to Dr. Durdin that she is able to do chores and even cuts the grass. R. Doc.11-7, Tr. 378. The Court notes that even the medical records from Southeastern Community Health Systems which were reviewed by the ALJ indicates that her musculoskeletal system was normal and that she had no physical disability which was observed during her evaluation of February 16, 2012. R. Doc. 11-7, 439-440.  She was prescribed a cane on

April 18, 2012, but she was not using an assistive device during her July 2012 appointment. R. Doc. 11-8, Tr. 491-3

The record also indicates that Shaffett told Dr. Durdin that she drives, does chores, and cares for her 18 year old son who just had ankle surgery, cleans the yard and cuts the grass. R. Doc.11-7, Tr. 378. The record further indicates that sometimes her son would do the chores which allows her to sleep. She further indicated that her house stays clean. *Id*. Shaffett testified that her son is disabled and that his "inner medical organs" are messed up.  She further testified that her son had become violent towards her in the past. R. Doc. 11-13, Tr. 1104.  The records indicate that her son had been approved for disability benefits. R. Doc. 11-7, Tr. 377.

While Shaffett contends that the ALJ failed to consider the limitations caused by her "depression and anxiety disorder" the record indicates that the ALJ noted that the Disability Determining Services ("DDS") reviewing psychologist found only mild symptoms of anxiety. R. Doc. 11-2, Tr. 24. The ALJ further noted that while the DDS psychologist found that there were some symptoms, the later record which was not available during the psychologist review indicated that Shaffett does not take medication for anxiety. As a result, the ALJ gave little weight to the mental impairment finding.  While Shaffett raises the issue that she saw a social worker who diagnosed her with Bipolar Disorder non-specific, she also indicated to Dr. Durdin that she was not seeking disability benefits due to any mental disorder only physical impairments. Doc.11-7, Tr. 378.

The Court notes that despite Shaffett's ailments, she was able to engage in daily life activities such as cleaning house and cutting the grass. *Id.*  Her alleged ailments neither singularly nor in combination were severe enough to prevent her from engaging in any major life activity.

Therefore, considering the totality of the evidence, the court finds that the ALJ's findings that Shaffett's ailments either singly or in combination were not disabling is supported by substantial evidence.

## IV.   **Recommendation**

**IT IS RECOMMENDED** that the decision of the Administrative Law Judge denying Lisa Ann Shaffett's Supplemental Security Income Benefits be **AFFIRMED**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within fourteen (14) days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).[10]

New Orleans, Louisiana, this 30th day of September,  2016

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**

---

[10]*Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.

15